**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

---

*IN RE: ENGLE CASES*                          Case No.  3:09-cv-10000-WGY-JBT

Pertaining to:

*Brown v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-10687
*Corcoran v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11363
*Drake v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11090
*Dybas v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-13698
*Fischer v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-13801
*Gray v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-13603
*Hecht v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11228
*Landau v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-13728
*Lennox v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-13744
*McLeod v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-14246
*Sowers v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11829
*Woodruff v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-12594
*Wozniak v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11941
*Zamboni v. R.J. Reynolds Tobacco Co., et al.*, Case No. 3:09-cv-11957

---

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' ALL-CASES MOTIONS IN LIMINE**

**I.    PLAINTIFF'S OPPOSITION RE IMPROPER ARGUMENTS AND
EVIDENCE.**

**1. Defendants' Motion to Preclude Relevant Evidence and Appropriate
Argument, Already Admitted in Previous Trials, Should be Denied.**

Under the guise of a motion *in limine*, and based on cherry-picked isolated

excerpts taken out of context, Defendants ask this Court to second-guess Judge Carr and

Judge Erickson's courtroom rulings and to issue rulings on matters currently pending

before these trial judges.  It is improper for Defendants to use this Court's "all cases"

motion *in limine* process as a court of first appeal, attempting to influence the rulings of

trial judges who are currently considering post-trial motions that raise identical

arguments.  Further, when viewed in context and with Defendants' cross-examinations and jury arguments, the challenged arguments and evidence are fair and appropriate subjects for closing argument.  Thus, Plaintiffs ask this Court to deny this Motion in its entirety, or at least defer to the trial judge to rule in context during trial.

### A. Defendants' Motion is an Improper Vehicle to Undermine Trial Judges' Rulings Based on the Entire Record and Interfere with Pending Post-Trial Issues.

Defendants should not be permitted yet another bite at the apple.  A motion asking the Court to vacate the judgment and grant a new trial is pending in front of Judge Carr (*Berger v Philip Morris USA Inc.,* Case No. 3:09-cv-14157).  In the *Berger* motion, Defendant Philip Morris USA makes many of the same arguments, citing the same portions of the record, as it does here.  *See Berger* Dkt. 139, Defendant's Motion for New Trial, or in the Alternative Remittitur, at 17-20.  Defendants filed a similar motion in *Kerrivan* before closing argument (*Kerrivan v RJ Reynolds Tobacco Co. et al*, Case No. 3:09-cv-13703, Dkt 91, Defendants' Motion To Preclude Plaintiff's Counsel From Making Improper Closing Arguments), and will likely raise these issues again in post-trial motions.  There is no reason Judge Carr and Judge Erickson will not be able to make sound post-trial rulings, having presided over the entire trial, hearing all the evidence and argument in context, and further briefing from the parties.  Plaintiffs respectfully ask the Court to defer ruling on this Motion to permit these and other trial courts to rule on such matters as they arise in trial.

### B. Plaintiffs May Highlight the Weaknesses in Defendants' Case and Comment on Witnesses' Credibility in Closing Argument.

Defendants seek to exclude vast swaths of relevant evidence and preclude fair and appropriate argument by mischaracterizing Plaintiffs' remarks as "improper" attacks on

-2-

Defendants' right to defend themselves.  When viewed in context, these comments on the weaknesses and inconsistencies in Defendants' theory of the case and the credibility of their witnesses are classic, appropriate closing argument.  For these reasons, trial judges generally have disagreed with Defendants' interpretation of the evidence and argument described in their Motion and overruled repeated objections and motions for mistrial on identical grounds.  *See, e.g.* Ex. 1, *Berger* Trial Tr. at 2438-40 ("He's not saying that you do not have a right to present a defense. But if somehow your defense is presented in bad faith or is based upon something that's false or untrue [*sic*]. He's not saying that…. I did not interpret his statement in that way, and I don't believe that the jury would.", Ex. 2, *Graham v RJ Reynolds Tobacco Co. et al*, 3:09-cv-13602 Trial Tr. Vol. VII Afternoon session, 206:18-207:3 (May 21, 2013)). Under the guise of a motion *in limine*, and based on cherry-picked isolated excerpts taken out of context, Defendants ask this Court to second-guess Judge Carr and Judge Erickson's courtroom rulings and to issue rulings on matters currently pending before these trial judges.  It is improper for Defendants to use this Court's "all cases" motion *in limine* process as a court of first appeal, attempting to influence the rulings of trial judges who are currently considering post-trial motions that raise identical arguments.  Further, when viewed in context and with Defendants' cross-examinations and jury arguments, the challenged arguments and evidence are fair and appropriate subjects for closing argument.  Thus, Plaintiffs ask this Court to deny this Motion in its entirety, or at least defer to the trial judge to rule in context during trial.). Defendants' cherry-picked snippets provide no basis for this Court to revisit prior rulings, nor does their Motion give sufficient context for this Court to preemptively rule on matters best left for the trial court's discretion.

Parties are free to challenge their opponents' theories of the case and comment on their witnesses' credibility.  An attorney is given "leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008); *see also Ratliff v. Schiber Truck Co*., 150 F.3d 949, 957 (8th Cir. 1998) ("Counsel are given wide latitude in arguing inferences from the evidence presented.").  As the federal court system's website explains:

> Closing arguments are the opportunity for each party to remind jurors about key evidence presented and to persuade them to adopt an interpretation favorable to their position. At this point, parties are free to use hypothetical analogies to make their points; to comment on the credibility of the witnesses, to discuss how they believe the various pieces of the puzzle fit into a compelling whole, and to advocate why jurors should decide the case in their favor.

Administrative Office of the U.S. Courts, "Differences Between Opening Statements and Closing Arguments," available at http://www.uscourts.gov/educational-resources/get-informed/federal-court-resources/opening-statements-closing-arguments.aspx (accessed Nov. 14, 2014).  In closing, parties are permitted to expose inconsistencies in an opponent's case.

When viewed in context, the arguments Defendants mischaracterize as "imposing liability" "for refusal to admit liability," Mot. at 1-3, merely point out weaknesses in their case and comment on their witnesses' credibility.  For example, in every Federal *Engle* progeny case to date, Defendants have contested that nicotine addiction caused the plaintiff's disease. Typically, Defendants offer evidence and argue that the smoker's free choice, not addiction, was the legal cause of disease. During closing argument, Plaintiffs' counsel has attempted to discredit this theory in several ways, including (1) pointing out

that Defendants' position is contrary to the overwhelming scientific consensus, Ex. 1, *Berger* Trial Tr. Vol. 15 at 2418-19, (2) showing Defendants' internal recognition that they cannot defend "free choice" when someone is addicted, *see*, *e.g.*, Ex. 3, *Berger* Trial Tr. Vol. 11 at 1877-78; and (3) arguing that the Defendants' position defies logic, since their experts and corporate representatives admit that addiction leads to persistent daily smoking, and that persistent daily smoking causes disease.  Ex. 1, *Berger* Tr. at 2531-33. To illustrate this latter point, Plaintiffs' counsel appropriately has commented on Defendants' witnesses' credibility –they will acknowledge that addiction causes smoking, and smoking causes disease, but they fail or refuse to admit the logical conclusion that nicotine addiction causes disease.  Defendants' effort to prevent Plaintiffs from arguing this crucial point, under the guise of Due Process, is little more than an attempt to remove a straightforward, evidence-backed closing argument from their opponents' quiver, because it has seemingly resonated with juries.

Likewise, when placed in context, Plaintiffs' evidence and arguments regarding Defendants' refusal to acknowledge current scientific evidence and past wrongful conduct appropriately point out the weaknesses and inconsistencies in Defendants' theories on punitive damages and comment on defense witnesses' credibility.  For example, in Phase II, Defendants routinely offer "mitigation" evidence, including current efforts to improve safety, reduce youth smoking, and cooperate with the FDA and other public health authorities.  *See, e.g.* Ex. 4, *Kerrivan* Trial Tr at 51:5-110:16; Ex. 5, Burkhart Trial Tr at 47:11-86:1, 107:6-139:6.  Based on this testimony, Defendants typically argue that they are "changed companies" that no longer require deterrence or punishment for the conduct that harmed the plaintiff.  *See*, *e.g.*, Ex. 4, *Kerrivan* Oct. 21,

2014, Tr. at 56-62 ("We support a single, consistent public health message on the role of cigarette smoking in the development of disease in smokers, and on smoking and addiction."). Defendants typically rely solely on corporate witness testimony to provide this "mitigation" evidence, asking juries to trust their version of current events.  In fairness, Plaintiffs' counsel is entitled to challenge these witnesses' credibility through cross-examination and then rebut Defendants' mitigation arguments based on their corporate witnesses' testimony.  For example, Plaintiff may point out that these witnesses continue to disagree with Surgeon General Report conclusions and refuse to admit that the company engaged in past wrongful conduct.  This evidence is not offered for the purpose of punishing defendants for defending themselves, but rather to challenge effectively Defendants' theory that no amount of punitive damages is warranted and to discredit their witnesses regarding "mitigation."[1]  For these reasons, just as trial courts have routinely overruled objections to this type of evidence and argument, this Court should deny or defer this Motion regarding "criticism of Defendants for defending themselves."

### C. Plaintiffs are Entitled to Suggest Inferences Based on the Record and Make Fair and Appropriate Analogies.

Defendants further seek to hamstring Plaintiffs from drawing fair inferences from the record, citing misleading snippets of closing argument permitted over or without objection.  Again, Defendants ask this Court to substitute its judgment for that of the trial judges who spend two weeks listening to the evidence from both sides and enforcing consistent boundaries for the parties' conduct at trial.  For example, Defendants seek to

---

[1] These examples are illustrative, not exhaustive.  Plaintiffs incorporate in full their response to Defendants' Motion to Limit the Testimony of Robert Proctor, Ph.D., filed contemporaneously with this Opposition, explaining additional reasons why this evidence is admissible, including to rebut the statute of repose defense.

preclude argument that Defendants' intentional conduct has caused the premature deaths

of hundreds of thousands of people, among them parents, children, grandparents, aunts,

uncles and siblings.  Mot. at 7.  Defendants do not mention that in *Berger*, the trial court

permitted this statement *over objection*.  Ex. 1, Berger Trial Tr. Vol. 15 2471.  Nor do

they note that in *Kerrivan*, Judge Erickson explicitly approved this line of argument over

Defendants' preemptive objection, calling it a "fair summary of the facts."  Ex. 6,

*Kerrivan* Trial Tr. Day 8 at 106-07 (Oct. 16, 2014).

      Context matters.  Defendants, however, omit *their* remarks that opened the door to

the arguments they now seek to preclude, as well as the supporting evidence.  For

example, after Defense counsel argued in closing that Mrs. Berger bore 100% of the fault

for her decision to start smoking as a 13- or 14-year-old girl, Trial Tr. at 2489-90,

attached as Ex. 1, her counsel appropriately responded in rebuttal that:

> the last people on earth who get to come in and blame Mrs. Berger
> for choosing to smoke at age 13 is the cigarette industry that
> studied 14-year-olds and kids and 13-year-olds and is the industry
> that used to come in and advertise to smoke, smoke, smoke. Those
> are the same people now trying to blame them.

*Id.* at 2539-40.  In this context, and only after Defendant opened the door (by arguing that

13-year-old Judith Berger should have listened to her father who told her that only

"hookers" and "call girls" smoke (Ex. 7, *Berger* Trial Tr. at 524)), Plaintiff's counsel

drew the analogy between a child who starts smoking in response to tobacco

advertisements and one who is injured after accepting candy from a stranger.  Mot. at 8.

This argument was a fair inference based on the record: at trial, the jury saw evidence in

the form of internal company documents indicating that cigarette manufacturers studied

adolescents at parks, playgrounds and swimming pools, where they could be interviewed

outside the presence of their parents.  Ex. 8, Berger Trial Tr. Vol. 6 at 904-12 (Sept. 4,

2014).   The trial judge, who viewed all the evidence and heard all the argument in the case, overruled Philip Morris's objection and denied its subsequent motion.  Ex. 1, Berger *Trial* Tr. Vol. 15 at 2539-41, 2545.  A post-trial motion that rests in part on these same grounds is currently pending before the trial court, and Philip Morris should not be permitted to use this Court as a de facto interlocutory appeal.

The other arguments Defendants cite fare no better when put back in the trial context from which they were extracted.  First, Defendants cite a truck driver accident analogy *that Defense counsel first used* as a purportedly improper argument by Plaintiff's counsel.  In both his opening statement and closing argument, Defense counsel employed a truck accident analogy to assist jurors in distinguishing between the concepts of medical and legal causation.  Ex. 7, Berger Trial Tr. Vol. 3 at 516-517, Ex. 1, Berger Trial Tr. Vol. 15 at 2510.  Plaintiff's counsel, in his rebuttal closing argument, merely converted the hypothetical from one illustrating ordinary negligence to one illustrating wanton, reckless, deliberately indifferent and/or intentional conduct.  Ex. 1, *Berger* Trial Tr. at 2543-44.

Similarly, the "warfare" analogy Defendants cite from the *Starbuck* trial conveniently omits Defense counsel's argument that preceded it.  Attempting to discredit one of the expert witnesses who testified on behalf of Mr. Starbuck, Defense counsel said to the jury:

> Take Dr. Cummings, for example.  Dr. Cummings is -- is passionate about tobacco companies, and that's, of course, his right, but you get to take that into account.  He considers himself to be involved in a war on tobacco. He brought that war into the courtroom.  This was a battle for him, and you are entitled to take that into account as you listen to it.

Ex. 9, *Starbuck*, Starbuck v RJ Reynolds Tobacco Co. et al, Case No. 3:09-cv-13250, Trial Tr. Vol. IX, Afternoon session, at 109 (May 15, 2014).  Defendants introduced the

"battlefield" theme, developing it through cross-examination of plaintiff's expert witness and in closing argument.  To cry foul when Plaintiff's counsel, accepting Defendants' theme as his argument's premise, responds in rebuttal that the expert's so-called "war" is a worthy cause does not inflame the jury's passions; it attempts to rehabilitate an expert's credibility using the same terms in which his credibility was assailed.

These are but three examples of a daily phenomenon in *Engle* progeny trials: Defendants introduce prejudicial evidence and make aggressive arguments, and then when Plaintiffs respond by walking through the open door, Defendants accuse Plaintiffs' counsel of impropriety and gross violations of Constitutional rights.  Still, when they cite a case invoking Adolf Hitler, perhaps Defendants tip their hand: no longer satisfied to be zealous advocates, they are using theatrics and selective editing to gain advantage in a different forum.  *See* Mot. at  10.  The continuous motion practice citing isolated half-statements out of context seem to have no end.  *See, e.g.,* Order Denying Defendants' Motion for Recusal at 5, *Starbuck v. R.J. Reynolds, et al.*, No. 3:09-cv-13250-WGY-HTS, entered Nov. 17, 2014 (Doc. 136) ("In short, the comments on which PM USA relies to try to cast doubt on my impartiality, when considered by an objective, disinterested, lay observer *fully informed of their context* would not raise a significant doubt about my impartiality or any concern that I am biased against tobacco defendants or defendants in products liability cases.") (emphasis in original).

This Court, without viewing each entire *Engle* trial in context or at least reading the full transcripts, is not in a position to fairly rule on trial-specific evidentiary issues.  In sum, Defendants' attempt to use a motion *in limine* to undermine trial court rulings and

influence pending post-trial motions is as improper as their examples are misleading.
The motion should be denied.

## II.   WHETHER WITNESSES SHOULD BE PRECLUDED FROM TESTIFYING ABOUT WHAT A SMOKER "WOULD HAVE DONE" SHOULD BE DEFERRED TO TRIAL

Defendants seek to prevent the jury from considering any testimony from any witness with useful knowledge as to what the smoker would have done in a specific set of circumstances.   Plaintiffs oppose and aruge that the issue must be deferred for determination at trial based on the anticipated testimony to be offered.

To the extent that Defendants are arguing that a smoker may not testify as to what he or she would have done in a given set of circumstances, the smoker should be permitted to so testify.   A smoker's own testimony about what he or she would do is based on his or her knowledge and perception, and the smoker has the best information to aid the fact-finder in determining a fact in issue – namely, what the smoker would have done.   Keeping that information from the jury removes helpful evidence contrary to Rule 701. Fed. R. Evid. 701       To the extent that Defendants are arguing that no other witnesses may testify about what the smoker would have done, the response is only slightly different.   A third-party witness testifying about what a smoker would have done may have knowledge based on perceptions that might be helpful in aiding the jury's determination.   For example, a witness may have witnessed the smoker's routine practices or the smoker's opinions on smoking.   *See, e.g*., Fed. R. Evid. 406. Accordingly, to the extent that the witness's testimony offers knowledge useful to the jury's determination of a fact in question, the testimony should be permitted.

Whether any *particular* witness's answer to a *particular* question would amount to speculation would depend on the specific witness and the specific question. Whether

such testimony would constitute speculation cannot be determined preemptively. Resolution of the issue should await trial.  Moreover, to the extent that Defendants contend that the witness's testimony would be self-serving, that argument would go to the weight the jury should assign to the testimony and not whether it should be admitted.

Finally, Defendants' argument may be read to preclude Plaintiffs from asking the jury to consider the common-sense reality that, as more information about smoking hazards has made its way into public discourse, the number of smokers has dwindled because people have heeded warnings against smoking.  Likewise, Defendants concealed internal knowledge regarding the hazards of smoking *because* Defendants knew potential smokers would act differently if they had accurate information regarding cigarettes. Plaintiffs should be permitted to argue based on logic alone that had a smoker known more about the extreme hazards of smoking, he would not have begun smoking in the first instance.

## III.     PLAINTIFF'S OPPOSITION RE "TIMELINE" DEMONSTRATIVE.

Nearly a dozen different Federal judges presiding over *Engle* progeny cases have permitted Plaintiffs to use a demonstrative timeline to aid the jury in understanding the evidence, over or without objection.  Defendants have also used similar aids; in at least one case, they used the same technique they now ask this Court to preclude: adding post-it notes to a continuous timeline throughout trial summarizing evidence.  *See, e.g.*, Ex. 10, *Burkhart v R.J. Reynolds Tobacco Co. et al,* Case No. 3:09-cv-10727, Trial Tr. Day 3, Afternoon Session (May 7, 2014) at 19:19-23, 51:20-52:23, 53:11-13, 54:9-22, 55:10-15, 56:18-24, 72:16-19, 76:5-7, 139:2-7; Ex. 12, *Burkhart* Trial Tr. Day 4, Afternoon Session, (May 8, 2014) at 67:3-68:25, 83:9-20, 97:20-98:10.  Jurors apparently find these timeline demonstratives helpful – in at least two cases, the jurors asked the Court to send

the parties' timelines back to the jury room during deliberations.  Ex. 13, *Searcy v R.J. Reynolds Tobacco Co. et al,* Case No. 3:09-cv- 13723, Trial Tr. Vol. 5 (Apr. 1, 2013) at 109:4-6; Ex. 14, *Burkhart* Trial Tr. Day 9 Morning Session (May 15, 2014) at 8:24-9:2. Nevertheless, these timelines have never been admitted as substantive evidence or summaries under Rule 1006, but rather are intended and used merely as pedagogical tools during trial.

Defendants do not challenge the use of timeline demonstratives—but rather ask that this Court now require in all cases that Plaintiffs start a new timeline "fresh" with each witness.  Mot. at 16.  Defendants offer no basis for this Court to reconsider previous rulings on Plaintiffs' demonstrative timelines and should not now be permitted to complain about a device they have also employed; on these bases alone, the motion should be denied.  *See, e.g.*, *S.E.C. v. Huff*, 2010 WL 541634, at *1 (S.D. Fla. Feb. 9, 2010) (relief on reconsideration is "an extraordinary remedy to be employed sparingly"); *United States v. Zarabozo*, 2008 WL 5062463, at *1 (S.D. Fla. Nov. 26, 2008) ("The standard for granting reconsideration is strict and will generally be denied[.]"); *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002) (a reconsideration motion will be denied unless the movant clearly establishes (1) a material intervening change in controlling law, (2) the availability of new evidence justifying reversal of the previous decision, or (3) the need to correct clear error or prevent manifest injustice).  Further, this belated objection has no basis in law or fact, impedes the trial court's broad discretion over presentation of the evidence, and frustrates the very purpose of demonstrative evidence—to help the jury understand the issues at trial, and thus, Plaintiffs respectfully ask the Court to deny this motion with prejudice or at least defer it

to trial, so that each judge can evaluate any proposed demonstrative in context. *See, e.g.*, *Contract Mgmt. v. Babcock & Wilcox Tech. Servs*. Y-12, LLC, 2012 U.S. Dist. LEXIS 102854, 2012 WL 2529214 (E.D. Tenn.June 29, 2012) (finding it "inappropriate and premature" to exclude demonstrative timeline aid before trial, and thus, "[t]he Court cannot, and will not, rule that this demonstrative aid, subject to its information being established as accurate and relevant and not being evidence intended for admission at trial is inadmissible at trial.").

Defendants concede that Courts may allow parties to present a chart or aid that summarizes evidence that has already been presented at trial. Specifically, Federal Rule of Evidence 611(a):

> provides the authority for a trial judge to allow the use of summary charts and exhibits based on evidence adduced at trial. . . . [M]any opinions have cited that rule as authorizing summaries of trial evidence, even though the placement and language of Rule 1006 indicates that it is intended to provide a substitute for presentation at trial of voluminous evidence and an escape from the Best Evidence Rule. Rule 611(a) is much more apt authority for summaries of evidence that has already been presented at trial. The rule plainly gives the trial judge leeway to permit or to disallow various forms of summary evidence in the interests of promoting a fair trial.

3 Stephen Saltzburg, et al., Federal Rules of Evidence Manual 611-6 (10th ed., 2011).

As Courts and commentators have long recognized, "[d]emonstrations are one of the most effective means of clarifying testimony." 4-611 Weinstein's Federal Evidence § 611.02 (citing *e.g.*, *United States v. Spoerke*, 568 F.3d 1236, 1249–1250 (11th Cir. 2009)). Generally, "courts look favorably upon the use of demonstrative evidence because it helps the jury understand the issues raised at trial." *Id.* (citing authorities). "The federal district courts have *significant discretion* to determine whether a particular demonstrative aid will indeed be helpful or cause confusion or prejudice under Rule

403." *James v. Haven Homes Southeast, Inc.*, 2011 U.S. Dist. LEXIS 19795,2011 WL

777971(M.D. La. Feb. 28, 2011) (citing Kenneth S. Broun, McCormick on Evidence §

214 (2009)) (emphasis added).

It is well within the Court's discretion to allow Plaintiffs to display a timeline

throughout trial.  *E.g.*, *United States v. Posada-Rios*, 158 F.3d 832 (5th Cir. 2000)

(holding no abuse of discretion where the government was permitted to display

throughout the trial a timeline and organizational charts because the charts, although not

admitted into evidence, were pedagogical devices, and the jury was instructed as to their

proper purpose).  Further, as here, Courts may allow demonstrative aids to summarize

documents, testimony, and expert opinion already in evidence, to contribute to the clarity

of the presentation, promote efficiency, and help the jury put together the evidence in a

complex trial.  *See id; United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980)

("[W]e reject Gardner's contention that the defense was unduly prejudiced by the

Government's use of a chart summarizing the  assets, liabilities and expenditures of the

appellant. . . . The chart was a summary of facts and calculations which were in evidence.

. . . The use of the chart in court contributed to the clarity of the presentation to the jury,

avoided needless consumption of time and was a reasonable method of presenting the

evidence. It was well within the discretion of the court to permit this use pursuant to Fed.

R. Evid. 611(a).'); *see also United States v. Stiger*, 371 F.3d 732 (10th Cir. 2004) (charts

summarizing expert opinion admissible under Rule 611(a) because they assisted the jury

in putting together the testimony in a complex trial).  Here, using this discretion, in trial

after trial, federal trial judges in *Engle* cases appropriately have allowed Plaintiffs to

build a continuous timeline throughout trial with multiple witnesses to summarize the

voluminous scientific documents describing conduct spanning 50 years, clarify the testimony, and aid the jury in putting together the evidence.[2]

Defendants fail to show that one timeline demonstrative – built during trial under the Court's close supervision—should be categorically prohibited under Rule 403. Defendants' primary objection is the obvious point that Plaintiffs' timeline is "argumentative"—but of course, demonstrative aids are not neutral—that is what distinguishes them from evidence. "Demonstrative exhibits are meant to 'illustrate or clarify a party's position,' and they are by definition "less neutral in [their] presentation' and thus are not properly considered evidence." *Baugh v. Cuprum S.A. De C.V.*, 730 F.3d 701, 706-707 (7th Cir. 2013) (quoting *United States v. Milkiewicz*, 470 F.3d 390, 396-98 (1st Cir. 2006) (internal citations omitted). Just because these timelines are persuasive does not make them misleading, confusing or unfairly prejudicial – and the trial court is in the best position to make that judgment call if an objection is raised.

Defendants' cited authorities are inapposite, unfavorable to their position, or both. For example, *United States v. Lord*, 710 F. Supp. 615, 618-619 (E.D. Va. 1989), had nothing to do with whether a party may display a demonstrative summarizing complex testimony and documents during trial, but rather addressed whether a court properly excluded a chart appearing for the first time in closing argument purporting to summarize

---

[2] Defendants' reliance on Judge Erickson's order in *Kerrivan* is misplaced.  In *Kerrivan*, the Court did not preclude Plaintiff from using the same timeline with multiple witnesses—in fact, Defense counsel did not object to Plaintiff's counsel using the board continuously with the expert witnesses Ex. 15, *Kerrivan v R.J. Reynolds Tobacco Co. et al*, Case No. 3:09-cv-13703, Trial Tr. Day 3 (Oct. 8, 2014) at 6:23-8:4; 10:19-23 .  The only limitation imposed was to require Plaintiff's counsel to wait until the end of the Plaintiff's testimony to add the sticky notes to the timeline. Ex. 16, *Kerrivan* Trial Tr. Day 6 (Oct. 14, 2014) at 284:2-15. Judge Erickson's Order further shows that Plaintiffs' timeline demonstratives are appropriate, and that any determinations regarding the presentation of evidence should be left to the trial judge's discretion.

witnesses' testimony--an objection expressly not at issue here.  The holdings in *United States v. Ray*, 370 F.3d 1039, 1047 (10th Cir. 2004), and *United States v. Baker*, 10 F.3d 1374, 1412 (9th Cir. 1993), undermine Defendants' arguments.  In *Ray,* the Court affirmed the trial court's judgment, holding that where, as here, there were many exhibits and witnesses spanning a multi-week trial, the trial court did not err in allowing the prosecutor to use summary charts with an expert during its case-in-chief. 370 F.3d at 1047.  Likewise, in *Baker*, the Court held that the lower court did not abuse its discretion under Rule 611 in admitting summary testimony from a live witness to help the jury put the evidence together, explaining that the Court properly instructed the jury on the limited scope and purpose of the testimony.  10 F.3d at 1412.   For the same reasons cited in *Ray* and *Baker*, this Court would not abuse its discretion in permitting Plaintiffs to display a continuous demonstrative timeline throughout these complicated, multi-week trials involving hundreds of exhibits and 50 years of conduct.

Defendants claim unfair prejudice, because they must wait until closing argument to challenge the accuracy of the timeline.  Not so.  Defendants have multiple opportunities to challenge Plaintiffs' timeline summarizing documents and testimony. For example, Defendants can object to a particular timeline event as irrelevant, misleading, or confusing.  They may cross-examine the witnesses regarding the timeline's accuracy.  They are free to offer testimony or documents to challenge Plaintiffs' evidence regarding the timeline of events.  Defendants have utilized all of these tactics during trial and cannot point to any case in which a Court was incapable of adequately handling an objection to a demonstrative.  Moreover, and perhaps tellingly, in

the course of nearly a dozen appeals and post-trial motions, Defendants have never challenged any Court's ruling regarding a plaintiff's demonstrative.

Finally, an order requiring Plaintiffs to "start fresh" with a new timeline for each witness would not address any of Defendants' stated concerns, but would impose an undue burden on Plaintiffs' presentation.  Defendants' objections that a timeline is "argumentative" and contains "misleading snippets of testimony" apply with equal force no matter how many timelines are developed during trial.  "Starting fresh," however, would needlessly complicate and impede Plaintiffs' presentation, add unnecessary delay and expense, and frustrate the well-recognized purpose of the demonstrative evidence— to clarify the evidence.  For these reasons, Plaintiffs respectfully ask the Court to deny the Motion or defer to each trial judge to rule on the demonstratives in context.

## IV.   THE "GALLUP DOCUMENTS" ARE ADMISSIBLE TO IMPEACH DEFENDANTS' EXPERTS

Defendants' expert historians opine that the public was aware of the health risks associated with smoking in the 1950s and quote Gallup polls to support this proposition. Plaintiffs will not affirmatively offer the Gallup documents at issue in their case-in-chief. However, if Defendants' experts utilize the Gallup polls in the way Gallup specifically advised against in the Gallup Manuscript, the letter from Gallup's editor-in chief to Defendants' expert, and the corresponding Wall Street Journal article ("Gallup documents"), Plaintiff is entitled to use these documents to cross-examine Defendants' experts.

In 1998, the editor-in-chief at Gallup, Frank Newport, wrote to Lacey Ford – a historian who testifies for the cigarette industry in cases such as these.  *See* Def's Ex. 19.

Dr. Newport wrote to "take exception to [Ford's] use of Gallup Poll data" two tobacco

trials:

> We believe that your analysis of historical Gallup Poll data about
> cigarette smoking leads to faulty conclusions about the risks which
> average Americans might have assumed they were taking when they
> started smoking prior to the Surgeon General package warnings in the
> 1960s...Specifically, your testimony attaches high importance to Gallup's
> June 1954 finding that 90% of Americans had heard or read that
> 'cigarette smoking may be a cause of cancer of the lung.'…In our
> opinion, 90% awareness of a controversy about a possible risk is not by
> itself indicative that the risk is common knowledge…Gallup's attitudinal
> measures about the risks of smoking in 1954 reveal widespread doubt
> about the medical connection between cigarette smoking and lung cancer,
> and do not support your conclusion that these risks were widely known.
> We request that when you use Gallup Poll data to characterize public
> opinion on the risks of smoking in the future, that you present the full
> range of measures that were asked and that you provide more careful
> interpretation of their meaning.

*Id.* Counsel for R.J. Reynolds in the two Florida cases was copied on Dr. Newport's

letter. *See id.*

Earlier that same year, two Gallup employees, Lydia Saad and Steve O'Brien,

drafted a Manuscript for presentation at the annual meeting of the American Association

for Public Opinion Research. *See* Def.'s Ex. 18.  The paper detailed the misleading

manner in which Dr. Ford presented Gallup's polls to juries. *Id.* at 2.  Gallup's objection

to the manner in which its polls were being misconstrued by the defense expert was

covered in the Wall Street Journal and was well known to the Defendants. *See* Ex. 17,

Milo Geyelin, Gallup Accuses Big Tobacco of Misusing Poll in Court, *Wall Street
Journal*, June 26, 1998.

The Gallup documents are admissible for the non-hearsay purpose of cross-

examining and impeaching Defendants' experts to the extent they use Gallup polls in the

very manner that Gallup protested.  Defendants' historians in these cases cite to Gallup polls in their reports in support of their opinion that there was widespread public knowledge of the health effects of smoking as early as the 1950s.[3]  Plaintiff should be permitted to introduce Gallup's critique of this use of Gallup's polls.

Defendants cite to several cases where the Manuscript written by Ms. Saad and Mr. O'Brian was excluded.  In the majority of the cases cited, however, the basis for the exclusion was simply that the Court was unclear about the relationship between Lydia Saad, Steve O'Brien and the Gallup organization.  *See* Def. Exs. 11, 13, 14.  Defendants now acknowledge in their motion that Ms. Saad and Mr. O'Brien were employees of Gallup.  In fact, Ms. Saad was the managing editor of Gallup, and Mr. O'Brien was Gallup's General Counsel.  *See* Ex. 21, Mar. 18 Dep. Lydia Saad, *Ball v. Philip Morris, Inc., et al.* at 16, 20.  Thus, there is no question regarding whether the Manuscript was written by Gallup.  Furthermore, the Court in the *Starbuck* case cited by Defendants indicated that documents from Gallup stating that its data was being used in a misleading way may be admissible.  *See* Def. Ex. 11.[4]

Finally, Defendants make much of the fact that Ms. Saad and Mr. O'Brien spoke on various occasions with counsel for plaintiffs in the two cases where Dr. Ford's

---

[3] *See e.g.* Ex. 18, Report of Elizabeth Cobbs Hoffman, *Lennox v. R.J. Reynolds*, p. 39-40 (citing 1954 Gallup poll and subsequent polls in support of proposition that the public was aware of the link between smoking and disease); Ex. 19, Report of Robert J. Norrell, *Drake v. R.J. Reynolds*, p. 43-44 (citing 1954 Gallup polls and subsequent polls in support of proposition that the public was aware of the health risks associated with smoking); Ex. 20 Report of Gregg Michel, *Corcoran v. R.J. Reynolds*, p. 19-20 (citing 1954 Gallup poll and subsequent polls in support of proposition that there was a high level of awareness that smoking was harmful to health).

[4] The Court stated, "[I]f you have other stuff to talk about that – there's something, you know, where Gallup has said…We want folks to know that they are – have—they are using our data in a misleading or invalid way, that's one thing.  But if some third party – we just don't know the connection."

testimony was an issue, and even imply that the Manuscript was manufactured behind the scenes by plaintiff lawyers.  This is simply not true.  Ms. Saad and Mr. O'Brien contacted counsel for the plaintiff to obtain transcripts and materials from the trials.[5] The plaintiff lawyers provided Gallup with transcripts and other information requested by Gallup and requested additional poll data from Gallup.  *See* Ex. 21, Saad Dep. at 30; Ex. 22, April 9, 1999 Dep. Frank Newport, *Ball v. Philip Morris, Inc., et al.* at 77.

The conversations between Gallup and plaintiff lawyers were innocuous.  Ms. Saad stated, "Generally – most of the conversations were very brief and just in terms of 'Could you please fax this,' you know…there're not memorable conversations."  Ex. 21, Saad Dep. at 3. The contact between Gallup and plaintiff lawyers was initiated by Gallup: "I'm very confident in saying that we contacted them first."  *Id.* at 33.  And despite Defendants' assertion to the contrary, the possibility of Gallup testifying for compensation was not discussed:  "Q: [T]he invitation to testify in trial was as a paid expert witness?  A.  Never got to that point…she didn't -- we didn't talk about you will be paid or you won't be paid or whatever."  Def. Ex. 17 at 64-65.

The Gallup organization was not co-opted by Plaintiff lawyers when it wrote the Manuscript and the letter to Mr. Ford.  Gallup acted independently to prevent its data from being misused and misrepresented:

> I feel there is a high degree of propriety in myself and Gallup attempting to see that Gallup Poll data are used correctly…I was signing a letter on behalf of the Gallup Poll…I felt it was appropriate as the head of the Gallup Poll to sign the letter… requesting that Dr. Ford give a full and

---

[5] Though Defendants imply that one of Plaintiffs' counsel on the cases at hand, Woody Wilner, was communicating with Gallup, neither Lydia Saad nor Mr. O'Brien spoke to Mr. Wilner.  Ex. 21, Saad Dep. at 31; s*ee also* Def. Ex. 17 (Steven O'Brien testifies that he spoke to Stephanie Hartley at the Spohrer Wilner law firm).

accurate representation of Gallup Poll data when he used it in whatever form.

Ex. 22, Newport Dep. at 105-106, 123.

If Defendants' experts choose to use Gallup polls in a way Defendants know is opposed by Gallup itself, it calls into question the experts' motives, credibility, and competence. Plaintiffs should be allowed to use these documents to impeach the Defendants' experts. When used in this way, the Gallup documents would not be hearsay as they would not be used to prove their truth, but to demonstrate the flaws in the experts' methodology. *See* Fed. R. Evid. 801(c). Gallup documents have been admitted in state court cases on this very basis.[6] Therefore, Plaintiffs respectfully request that the Court deny Defendants' motion.

## V.     PLAINTIFFS DO NOT INTEND TO INTRODUCE EVIDENCE OF THE MERGER BETWEEN LORILLARD, INC. AND REYNOLDS AMERICAN, INC IN PHASE I OF ANY TRIAL.

Defendants seek to exclude all evidence and argument concerning the pending $27.4 billion acquisition of Lorillard, Inc., by Reynolds American, Inc. Plaintiffs do not intend to introduce evidence regarding the "potential" transaction during any plaintiff's case in chief during Wave 7. Plaintiffs reserve the right to seek admission of such evidence during the punitive damages phase on any trial, should one occur. Plaintiff will argue the merits of Defendants' Motion and the admissibility of such evidence at that time, if needed. At this time Plaintiffs ask the Court to deny Defendants' Motion

---

[6] *See* Ex. 23, Trial Transcript at 2408-2410, *Webb v. R.J. Reynolds Tobacco Co.*, No. 38 2009 CA 001285, November 10, 2010 (Wall Street Journal article used to cross-examine defendant's historian); Ex. 24, Trial Transcript at 2138-2141, *Schlenther v. R.J. Reynolds Tobacco Company, et al.*, No. 10-005736, October 11, 2012 (Overruling defense counsel's hearsay objection to allow use of the Wall Street Journal article to cross examine Defense historian).

as moot.

Dated: November 17, 2014

Respectfully submitted,

By:    /s/ *Sarah R. London*

Lance V. Oliver
Fla. Bar No:  96085
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29466
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

Elizabeth J. Cabraser
California Bar No. 83151
Richard M. Heimann
California Bar No. 063607
Robert J. Nelson
California Bar No. 132797
Sarah R. London
California Bar No. 267083
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Kenneth S. Byrd
Tennessee Bar No. 23541
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North
One Nashville Place, Suite 1650
Nashville, Tennessee  37219
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965

*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

On November 17, 2014, I electronically filed this document through the ECF

system, which will send a notice of electronic filing to all counsel of record.

A complete, duplicate copy of this document, along with a copy of this Certificate

of Service, has been forwarded directly to Judge Young in Boston, MA by priority mail

or other expedited delivery, addressed to:

> Jennifer Gaudet, Deputy Clerk
> United States District Court
> Clerk's Office, Suite 2300
> 1 Courthouse Way
> Boston, MA  02210

*/s/  Sarah R. London*

Sarah R. London
